# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JERRY BEEK, | ) | CASE NO. 8:09CV468 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE,  Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now before the court is the Complaint of Plaintiff Jerry Beek. (ECF No. 1.) Beek

seeks review of the Commissioner of the Social Security Administration's decision to deny

his application for disability insurance benefits under Title II of the Social Security Act (the

Act), 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) benefits under

Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*   The court has carefully considered the

transcript of the administrative record (ECF No. 12) and the parties' briefs (ECF Nos. 13,

20 and 21).  For the following reasons, the Commissioner's decision will be affirmed.

## PROCEDURAL BACKGROUND

Beek filed his application for disability insurance benefits on April 12, 2006.  (Tr. at

73-77.)  After his application was denied initially (*id.* at 52, 60–63) and on reconsideration

(*id.* at 54-59), he requested a hearing before an administrative law judge ("ALJ") (*id.* at 51).

This hearing was held on December 10, 2008 (*e.g., id.* at 18), and in a decision dated

November 4, 2008, the ALJ concluded that Beek was not entitled to disability insurance

benefits (*id.* at 18-28).[1]  Beek then requested that the Appeals Council of the Social

---

[1] The ALJ's decision states, "It is noted that, on January 4, 2007, Mr. Beek filed an
application [for] the payment of supplemental security income benefits under Title XVI of

Security Administration review the ALJ's decision. (*Id.* at 14.) This request was denied on October 23, 2009 (*id.* at 7-9); therefore, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## FACTUAL BACKGROUND

Beek alleges that he became disabled on April 30, 2006, due to diabetes, speech problems, blindness in his right eye, and deafness. (Tr. at 81, 138.) He was born in September 1964 (*e.g.*, *id.* at 73); thus, he was 41 years old on the date of his alleged onset of disability. He completed the 12th grade, and he had no special education classes. (*Id.* at 85. *But see id.* at 188 (indicating that Beek graduated from the Iowa School for the Deaf High School).) He has worked as a dishwasher and prep cook at a restaurant and as a receiver at a brewing company. (*Id.* at 82.) Also, Beek testified that his landlord was paying him $50 per week for maintenance work and cleaning. (*Id.* at 370.)

### Medical Evidence[2]

On January 24, 2006, Beek visited Rachel Stearnes, D.O., at the Clarkson Family Medicine Clinic in Omaha, Nebraska, with complaints of right arm pain. (Tr. at 217-18.) He reported that he had been "repetitively pushing large heavy boxes" at work "when he

---

the Social Security Act, as amended, and that application has been escalated to the hearing level." (Tr. at 18.)

[2] This review of the medical evidence will focus on records dating back to approximately April 2006, which is the alleged disability onset date, and continuing through the date of the hearing before the ALJ. It emphasizes the records cited by the parties in their briefs. I note in passing that the records discussed in the Plaintiff's brief date to April 2004, and that these records describe health problems very similar to those that will be discussed in the following review. (*See, e.g.*, Tr. at 243 (documenting Beek's complaints of peripheral neuropathy, low blood sugars, and diarrhea on April 26, 2004); *see also* Pl.'s Br. at 3, ECF No. 13.)

started noticing the pain." (*Id.* at 217.)  Dr. Stearnes had been struggling with Beek "for several months regarding his income and being able to afford his medications as well as his insulin." (*Id.* at 219.)  She noted that Beek "has been very poor in compliance with his diabetic medications" and "does not take care of himself." (*Id.* at 217).  More specifically, she said that Beek was not taking his insulin or checking his blood sugar, was not purchasing insulin because he "comes up with other things to buy," was drinking "lots of caffeine," and was not eating "on a regular basis." (*Id.*)  Beek reported having "2 episodes in the last 2 weeks where he woke up on the bathroom floor and did not know how he had gotten there," and Dr. Stearnes suspected that "these [were] secondary to either hyperglycemic or hypoglycemic episodes." (*Id.*)  Dr. Stearnes examined Beek and found no evidence of edema in his lower extremities, "no significant pain to palpation over the musculature or joints," "no evidence of lack of lymphatic drainage or clots," and a bit of swelling in his right fingers. (*Id.*)  Dr. Stearnes provided Beek with samples of Celebrex to help with his arm pain, instructed him to complete paperwork to "get a new case worker," and advised him to return in one week. (*Id.* at 218.)

On February 1, 2006, Dr. Stearnes noted that Beek "is again in a state of disaster." (Tr. at 216.)  Her report states, "He is very tired.  He has not been taking care of himself.  He continues to not be compliant with his glucose monitoring and insulin." (*Id.*)  Dr. Stearnes decided that Beek needed "to be admitted for glucose regulation and social work consultation." (*Id.*)

On February 14, 2006, Beek visited Dr. Stearnes "for followup from his hospitalization" for "uncontrolled diabetes mellitus type 2." (Tr. at 214.)  According to Dr. Stearnes' record, the "[p]urpose of his admission was to get social work involved, so that

3

they may help him afford his medications," but "[t]hey were of little help."  (*Id.*)  Beek reported continued right arm pain, which he attributed to "pushing boxes around at work." (*Id.*)  He also said that he was considering taking some time off work and quitting one of his jobs in order "to get his sugars under control, and to get well and feel better."  (*Id.*) Examination revealed no swelling or skin breakdowns on Beek's lower extremities, apart from a superficial blister on his left Achilles area.  (*Id.* at 215.)  The exam did reveal pain in Beek's right arm upon touching, flexion, and extension.  (*Id.*)  Dr. Stearnes instructed Beek to continue taking his "Lantus insulin" as directed, and she expressed concern that he might be taking it every 12 hours instead of every 24 hours.  (Id. at 214-15.)  She wrote him "a note to excuse him from work until next Monday to get his blood sugars under better control."  (*Id.* at 215.)  She also gave Beek more Celebrex samples for his arm and instructed him to use ice and to rest.  (*Id.*)

Beek visited Dr. Stearnes again on February 21, 2006.  (Tr. at 212.)  He reported feeling good after his week off and said that he was "working on getting himself into some government housing."  (*Id.*)  Dr. Stearnes noted that Beek "seems to be doing well with compliance regarding his medicines within the last couple of weeks," but she was concerned that one of his medicines was causing him "lower extremity edema."  (*Id.*) Indeed, after her examination revealed "some trace 1+ pitting edema on [Beek's] lower extremities bilaterally," she ordered a medication change.  (*Id.*)  Dr. Stearnes also increased Beek's Lantus insulin prescription.  (*Id.*)

On May 30, 2006, Beek returned for a follow-up with Dr. Stearnes.  (Tr. at 210.)  Dr. Stearnes noted that in the past, Beek "worked too many hours and made too [much] money to qualify" for Medicaid, but Beek had since "quit all of this jobs and now is currently in the

4

process of getting Medicaid." (*Id.*)  He had run out of some of his medicines, however, and he had no money to replace them. (*Id.*)  He complained of dizziness, weight loss, bilateral leg pain, shortness of breath, and intermittent chest pain. (*Id.*)  Dr. Stearnes noted that Beek was "still smoking 1 pack of cigarettes per day." (*Id.*)  She also noted that he was "stuttering[,] which is not new for him." (*Id.*)  There was no edema in Beek's lower extremities, but there were "several areas of scarring on his anterior shin from previous sores," and he had a blister that appeared "to be healing without too much difficulty." (*Id.*)  Dr. Stearnes told Beek that he should "use the money that he uses for cigarettes to buy his insulin," and advised him to stop smoking. (*Id.* at 211.)  She also told him that his leg pain "is likely secondary to his sugars being poorly controlled." (*Id.*)  Dr. Stearnes advised Beek to start back up on his insulin and return in one week for a follow-up. (*Id.*)

On June 14, 2006, Samuel E. Moessner, M.D., performed a consultative examination of Beek. (Tr. at 185-196.)  Beek reported that he had been "off his insulin since April 2006," and was no longer checking his blood sugars. (*Id.* at 185.)  He also had a history of vision and hearing difficulties and "a stuttering or stammering disorder, which is chronic." (*Id.*)  Beek said that he lost the use of his right eye in childhood due to complications from an attempted cataract extraction, and he wears a hearing aid in his right ear. (*Id.* at 186.)  With the hearing aid, he can hear conversational speech. (*Id.* at 189.)  Beek complained of "weakness in both of his legs with a lot of aching and pain," "burning in his feet" that causes him to wake at night, and problems "staying on his feet for any length of time." (*Id.* at 185-86.)  He said that he could walk about eight blocks "without much difficulty"–though he would have leg pain–and that he could "probably lift about 45 pounds when he has to," but he could not do so frequently. (*Id.* at 186.)  He said that he

5

could "only lie down for about two or three hours at a time" before "burning or shooting pains in his feet or other symptoms" awaken him, and he said that he has problems standing, sitting, balance, squatting, stooping, climbing stairs, bending, and twisting. (*Id.*) He also told Dr. Moessner that "his headaches, dizzy spells, dyspnea and weakness cause problems at work [because] other employees such as the head chef reported his problems to the management and he was asked to take some time-off, and he has not been brought back to work." (*Id.* at 187.) Beek said that he has "abdominal discomfort at times" and diarrhea with "occasional urgency of defecation" and "occasional accident during the night." (*Id.* at 189.) He had no driver's license, but he walked or rode the bus when necessary. (*Id.* at 188.)

Dr. Moessner examined Beek and noted that he appeared "frail" and "malnourished." (Tr. at 191.) He also noted that although Beek "turns his head slightly to the left as he listens to questions, . . . his hearing seems quite adequate, [and he] even hear[s] some whisper speech." (*Id.   But see id.* at 193 (noting that Beek occasionally asked Dr. Moessner to repeat himself).) There was no cyanosis or edema in Beek's extremities, but there was a "trace of clubbing." (*Id.* at 194.) His diagnoses included diabetes mellitus, type 2; history of congenital deafness, partially corrected with hearing aid on right ear; blindness of the right eye; chronic stuttering or stammering disorder; right shoulder traumatic arthritis; and history of gastroesophageal reflux disease. (*Id.* at 195.) Dr. Moessner noted that Beek seems "reasonably intelligent," but "does not have a particularly strong understanding of diabetes or his other health problems." (*Id.* at 196.) He also noted that he was concerned about Beek's recent weight loss. (*Id.*)

6

On July 6, 2006, Beek visited Dr. Stearnes with complaints of bilateral leg pain and right lower extremity edema.  (Tr. at 208.)  He reported that "he started retaking his medicines a few weeks ago and that is when he started noticing the swelling."  (*Id.*)  His sugars were "relatively good," and his weight was up nine pounds from his May 2006 visit.  (*Id.*)  His lower extremities had "several areas of scars from various skin breakdown," and he had "1+ to 2+ edema from the mid shin down, but [it was] nonpitting."  (*Id.*)[3]  Dr. Stearnes instructed Beek to continue taking his medicine and checking his blood sugar.  (*Id.* at 209.)

On July 7, 2006, Glen Knosp, M.D., performed a physical residual functional capacity assessment of Beek based on a review of the record.  (Tr. at 158-167.)  Dr. Knosp opined that Beek could lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 159.)  He also opined that Beek could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but could not climb ladders, ropes, or scaffolds.  (*Id.* at 160.)  Dr. Knosp noted that Beek was limited by blindness in his right eye and his stammering disorder; that Beek should avoid moderate exposure to extreme cold; and that Beek should avoid concentrated exposure to extreme heat and to hazards.  (*Id.* at 161-62.)  Dr. Knosp wrote,

> Claimant's allegations are partially credible.  He has poor control of diabetes mellitus related to poor compliance.  When compliant he had fair to good control.  He follows no special diet.  He is blind in the right eye but adequate vision in the left eye.  He does have stammering problem with his

---

[3] Nonpitting edema is "swelling of subcutaneous tissues that cannot be indented easily by compression." *Stedman's Medical Dictionary* 612 (28th ed. 2006).  Pitting edema, in contrast, is swelling "that retains for a time the indentation produced by pressure." *Id.*

speech.  Hearing is adequate with right hearing aid.  Claimant does not meet
or equal any listing and if compliant with medical care and advice, appears
capable of work as outlined in the RFC.

(Tr. at 167.)

On July 11, 2006, Dr. Stearnes wrote a letter to Elsa Miller at the Nebraska Health
and Human Services System.  (Tr. at 199.)  In this letter, Dr. Stearnes listed Beek's
impairments and commented that his "list of medicines" was "quite extensive."  (*Id.*)  She
then explained that Beek had difficulty controlling his blood sugars, partly because his job
schedule affected his diet.  (*Id.*)  She wrote that Beek functioned fairly well when he was
able to take his medications as prescribed, but he has had problems purchasing his
medication.  (*Id.*)  In conclusion, she expressed her hope that Beek would be given
Medicaid benefits to help him purchase his medications.  (*Id.*)  Also on July 11, 2006, Dr.
Stearnes completed a form for the Nebraska Health and Human Services System.  On this
form, Dr. Stearnes indicated that Beek would be unable to obtain employment until his
blood sugars are controlled and his "secondary symptoms from poor glucose control
resolve."  (*Id.* at 200.)

Beek visited Dr. Stearnes again on July 13, 2006, and reported that his lower
extremity swelling had resolved.  (Tr. at 206.)  He also reported that his blood sugars had
been low in the morning.  (*Id.*)  On examination, no edema was found in the lower
extremities, and "[n]o obvious worsening in skin breakdown [was] noted."  (*Id.*)  Dr.
Stearnes adjusted Beek's diabetes medication and instructed him to call if he continued to
have low sugars.  (*Id.*)

On July 28, 2006, Beek reported to Dr. Stearnes "pleuritic chest pain" that worsened
when he took a deep breath.  (Tr. at 203.)  Dr. Stearnes noted that Beek had a history of

8

coronary artery disease and "persistent chest pain on a regular basis that has been deemed noncardiac in origin." (*Id.*) Beek also reported that he had "only been taking minimal medication secondary to financial difficulty," that he was suffering from "persistent diarrhea," and that he had "some bruising in the areas of ulceration on his lower extremities." (*Id.*) Beek's lower extremities were without edema, though he did have "multiple areas of scarring and scabbing." (*Id.* at 204.) Dr. Stearnes adjusted Beek's medication, but declined to order blood work due to the cost. (Id.) She diagnosed Beek's chest pain as pleurisy, and she gave him samples of Aleve. (*Id.*) She also gave him samples of antibiotic ointment for his leg wounds, along with other medications. (*Id.* at 205.) In addition, Dr. Stearnes discovered that one of Beek's medicines was making his diarrhea worse, and Beek reported that his condition improved after he stopped taking that medicine. (*Id.* at 202.)

On November 10, 2006, Dr. Stearnes wrote a letter to Dan Blum of "Diversion Services" in Omaha requesting for Beek "any sort of medical assistance in [the] form of money or help with . . . medicines." (Tr. at 201.) She wrote that Beek had "a hard work ethic and at one time was working three jobs, but because of this was unable to control his diet and his sugars." (*Id.*) She added that she advised him to cut back on his work to improve his health, and that he is now "unable to work and therefore unable to afford his medicine." (*Id.*)

Dr. Stearnes wrote another letter concerning Beek on January 10, 2007. (Tr. at 198.)[4] In this letter, Dr. Stearnes again noted that Beek did not function well without his

---

[4] The letter does not specify an addressee.

medicines, that Beek was unable to afford his medicines, and that Beek "seems to have fallen between the cracks as far as being able to obtain his medicines." (*Id.*)

On January 24, 2007, Beek visited Dr. Stearnes with complaints of "no energy." (Tr. at 339.) He had been unable to purchase all of his medicines or strips to check his sugars. (*Id.*) Dr. Stearnes noted that Beek was under a lot of stress due to his inability to obtain medicine or qualify for Medicaid, and he was continuing to smoke. (*Id.*) She adjusted his medication and noted that he might "need to be hospitalized to get better control of his sugars so that he feel[s] better." (*Id.*)

Beek returned to Dr. Stearnes for a follow-up on January 31, 2007. (Tr. at 338.) He had no swelling in his lower extremities, but he was suffering from an upper respiratory infection. (*Id.*) Dr. Stearnes advised Beek that she felt that he was able to work at least part-time, and she told him that she planned to complete Beek's disability paperwork "accordingly." (*Id.*)

Dr. Stearnes completed a physical functional capacity assessment form for Beek on February 5, 2007. (Tr. at 268-69.) She opined that during the course of an eight-hour workday, Beek could sit continuously for one hour, stand continuously for one hour, and walk between 30 minutes and one hour. (*Id.*) She added that Beek could sit for a total of eight hours during a workday, and he could stand or walk between five and eight hours per workday. (*Id.*) Although she believed that he was capable of working for a total of eight hours per day, she also indicated that his attendance at work would be "[i]nconsistent or sporadic due to reasonably expected exacerbation of condition(s)." (*Id.*) Dr. Stearnes also indicated that Beek could frequently lift up to ten pounds and occasionally lift up to 50 pounds during an eight hour workday. (*Id.*) She added, however, that his symptoms were

10

frequently "severe enough to interfere with attention, concentration, persistence and pace." (*Id.* at 269.)

On February 23, 2007, Beek reported to Dr. Stearnes that he had not been testing his blood because he could not afford test strips, and he was feeling tired despite sleeping a lot. (Tr. at 336.) An examination revealed "one small area of skin breakdown" on his ankle, but it was "pretty superficial" and did not appear to be infected. (*Id.*)

On March 9, 2007, Dr. Stearnes completed a "Diabetes Mellitus Residual Functional Capacity Questionnaire" for Beek. (Tr. at 270-74.) On this form, Dr. Stearnes listed Beek's symptoms and noted that they were reasonably consistent with his impairments. (*Id.* at 270-71.) In contrast to the form she completed in February, Dr. Stearnes opined that Beek could sit or stand for up to only 30 minutes at a time, that he could sit or stand for a total of about four hours during an eight-hour workday, that he could rarely lift 20 pounds, and that he could never lift 50 pounds. (*Id.* at 271-72.) She also opined that Beek would "need a job that permits shifting positions at will," and that he would need unscheduled 15-minute breaks every one or two hours." (*Id.* at 272.) She added that his legs would need to be elevated about 50% of the time if he were working in a sedentary job. (*Id.*) Finally, Dr. Stearnes opined that Beek would likely be absent from work about four days per month due to his impairments. (*Id.* at 274.)

Beek visited Dr. Stearnes again on March 23, 2007. (Tr. at 334-35.) Beek reported that he had been forgetting to take his Lantus and that he had not been checking his blood sugars "because he has not gotten a glucometer yet." (*Id.* at 334.) He also admitted to tobacco and caffeine use, despite having been counseled to stop both. (*Id.*) Beek reported that he "recently did get his child support case dropped secondary to him being

11

unemployed," and that he was "working on his SSI disability." (*Id.*)   He complained of leg pain and difficulty sleeping.   (*Id.*)   Dr. Stearnes provided Beek with enough samples of Lantus to "last him quite a while," and noted that "it seems just as though social problems for Jerry are keeping him from being able to get a little bit more healthy."  (*Id.* at 335.)

On April 9, 2007, Beek returned to Dr. Stearnes for a follow-up.  (Tr. 332-33.)  Dr, Stearnes noted that she had been seeing Beek at no charge and providing him with free samples of medicine, but Beek was still unable to afford a glucometer test strip.  (*Id.* at 332.)  He also said that he did not want to get a job because "he will lose his Section Eight housing and his rent will go up from 10 dollars a month to over 400 dollars a month, and he cannot really afford that right now."  (*Id.*)  He said that "he might wait till this summer, and if things do not change, he is probably going to end up having to get a job." (*Id.*)  Beek complained of foot pain, and he reported that he had been picking at an ulcer on his ankle. (*Id.*)  On examination, Dr. Stearnes observed a one centimeter open ulceration on Beeks ankle that was "pretty superficial," and she noted that Beek had "pain to deep palpation" on both plantar fascia.  (*Id.*)  She instructed Beek to ice his feet, provided him with Band-Aids, and instructed him to stop picking at his ulcer.  (*Id.* at 332-33.)

Beek visited Dr. Stearnes again on June 13, 2007.  (Tr. at 330.)  Dr. Stearnes noted that Beek "is able to work but really does not want to because then he will lose his state-provided housing."  (*Id.*)  He complained of chest pain.  (*Id.*)  An EKG showed "no acute changes and no changes from previous EKG," and a "[c]hest x-ray show[ed] no acute cardiopulmonary findings."  (*Id.*)  An examination revealed "some skin breakdown" on Beek's shin, without infection.  (*Id.*)  Dr. Stearnes thought that Beek should be admitted to

12

the hospital due to his poor diabetes control and chest pain, but Beek refused.  (*Id.*)  He was asked to return for a follow-up in two weeks.  (*Id.*)

Beek returned for a follow-up on June 27, 2007.  (Tr. at 325.)  He reported that he was feeling relatively well, but he was experiencing swelling in his right foot and pain in his calf.  (*Id.*)  On examination, Dr. Stearnes noted that Beek had "1+ to 2+ pitting edema from the mid shin down" on his right leg,  some tenderness in the calf, and some scabs on his shin and ankle.  (*Id.*)  Dr. Stearnes provided Beek with sample medications, ordered a venous Doppler to determine whether there was a clot in his right leg,[5] and directed Beek to follow up in two weeks with Dr. Rebecca Lancaster.  (*Id.*)

On July 11, 2007, Beek visited Rebecca Lancaster, M.D., at the Nebraska Medical Center Clarkson Hospital-University Hospital with complaints of swelling and ulcerations on his right leg.  (Tr. at 319.)  Examination revealed "an ulcerated lesion with a little granulation tissue on top and surrounding erythema" on the right leg and a second lesion on the right ankle.  (*Id.*)  There was no pitting edema on the right leg, and it appeared to be "about the same size as the left leg."  (*Id.*)  Dr. Lancaster suspected that the edema was "caused by the lesions," and she instructed Beek to keep them covered, apply an ointment that she supplied for him, and avoid picking them.  (*Id.* at 319-20.)

Beek returned to Dr. Lancaster on August 7, 2007, and reported that he was falling because he has been losing feeling in his legs.  (Tr. at 317.)  Testing revealed "some decreased sensation over his foot and big toe."  (*Id.*)  There was no evidence of edema, and his ulcers appeared to be stable.  (*Id.*)  Dr. Lancaster offered to admit Beek to the

---

[5] The record indicates that the right leg venous examination revealed "no evidence of deep venous thrombosis or deep venous valvular incompetence."  (Tr. at 327.)

13

hospital "to get his blood sugars under control and to get him in touch with Social Work," but he refused.  (*Id.* at 318.)  She directed him to increase his Lantus and return in one month.  (*Id.*)

On September 7, 2007, Beek returned to Dr. Lancaster for a follow-up.  (Tr. at 315.) Dr. Lancaster noted that Beek was "finally . . . able to get in touch with the Diabetes Clinic and get his lancets and strips for his glucose monitor," and he brought in a blood sugar book showing the range of his sugar levels.  (*Id.*)  He complained of chest pain with shortness of breath and some leg ulceration.  (*Id.*)  He also reported that he had no interest in stopping smoking and had not attempted to cut back.  (*Id.*)  On examination, Dr. Lancaster found no edema and noted that although Beek had a few sores near his knees, the sores observed during prior examinations had healed.  (*Id.*)  Beek's heart showed a 2/6 systolic murmur, and Dr. Lancaster "strongly recommended" that Beek consider admission to the hospital, but he "adamantly refuse[d]."  (*Id.* at 315-16.)  Dr. Lancaster directed Beek to return on September 10 for a cardiac stress test.  (*Id.* at 316.)

On September 28, 2007, Beek returned to Dr. Lancaster for a follow-up.  (Tr. at 314.)  Dr. Lancaster noted that although Beek's EKG and stress test were normal, he still complained of chest pain.  (*Id.*)[6]

Beek visited Dr. Lancaster again on November 6, 2007.  (Tr. at 312.)  Beek reported that he had not been eating regularly "because he is either not hungry or he has some bouts of diarrhea when he eats."  (*Id.*)  He added that despite taking Imodium pills, he occasionally has accidents at night.  (*Id.*)  Beek also complained of weakness in his legs

---

[6] The record of Beek's September 28, 2007, visit with Dr. Lancaster is incomplete.

14

and chest pain.  (*Id.*)  Dr. Lancaster made no changes to Beek's diabetes medicines despite his fluctuating blood sugar readings, but she did provide him with free medication samples.  (*Id.* at 313.)  She also recommended that he eat regular meals and increase his Imodium, and she noted that her office would work with Beek to secure "Charity Care" and "to get some of his medications covered through the I-Care Program."  (*Id.*)

On November 26, 2007, Beek returned to Dr. Lancaster for another follow-up.  (Tr. at 310.)  Dr. Lancaster noted that, with one exception, Beek's low blood sugar readings had been eliminated.  (*Id.*)  Beek reported that he still experiences chest pain, though he was not feeling the pain on this particular day.  (*Id.*)  He also reported that he had some ulcerations on his shins and knees, but they were healing.  (*Id.*)  Because Beek's low blood sugar had been addressed, Dr. Lancaster ordered an increase in Beek's Lantus, and she was able to provide him with a supply of the medicine.  (*Id.*)

Beek visited Dr. Lancaster again on December 19, 2007.  (Tr. at 308.)  Beek's blood sugars had been measured across a wide range, and he complained of chest pain and shortness of breath.  (*Id.*)  He said that he was doing well with Imodium, but he was still having some diarrhea.  (*Id.*)  After examining Beek, Dr. Lancaster noted that he had no swelling, ulcerations, or foot sores.  (*Id.*)  She advised Beek to increase his Lantus, monitor his blood sugars, and add fiber to his diet.  (*Id.* at 308-09.)  She also advised him to stop smoking to address his shortness of breath.  (*Id.* at 309.)

Beek returned to Dr. Lancaster's office for a follow-up on March 24, 2008.  (Tr. at 306.)  He reported that he had not increased his Lantus, though he had plenty of the medicine at home.  (*Id.*)  He also reported that his sugars had been elevated, that he often felt fatigued, that he was experiencing numbness and tingling in his fingers, and that he had

15

some sores on his lower extremities.  (*Id.*)  An examination revealed some open scabs on Beek's ankles and some numbness in his fingers, though "overall [he had] some sensation there." (*Id.*)  Dr. Lancaster advised Beek to increase his Lantus, call in to report his blood sugar in five days, and schedule a follow-up in one week.  (*Id.* at 307.)  She also provided him with samples of ointment for his sores.  (*Id.*)

Beek followed up with Dr. Lancaster on April 4, 2008.  (Tr. at 304.)  Dr. Lancaster noted that she spoke with Beek on the phone one week ago and, after learning that Beek's sugars remained elevated, ordered him to increase his Lantus again.  (*Id.*)  Beek reported that he had gained about 14 pounds, but he had no chest pain or shortness of breath.  (*Id.*)  He also reported swelling in his left leg, and he noted that he had been picking at the scabs on his lower extremities.  (*Id.*)  Examination revealed "1+ pitting edema on the left lower extremity and trace edema on [the] right lower extremity."  (*Id.*)  Lesions on the right lower extremity appeared to be closed and well-healed, and there was a superficial open lesion on the left ankle.  (*Id.*)  Dr. Lancaster instructed Beek to split his Lantus into two doses, continue using his ointment, and to follow up immediately if his swelling increased.  (*Id.* at 305.)

On April 11, 2008, Beek followed up with Dr. Lancaster.  (Tr. at 302.)  Dr. Lancaster noted that Beek's blood sugars had been "very variable," and that he had two hypoglycemic episodes during the previous day.  (*Id.*)  Beek reported that he had not been eating regular meals; instead, he "just seems to be eating all the time and quite frequently eats very sugary foods."  (*Id.*)  Beek denied chest pain or shortness of breath, and he said that his ulcer and left leg swelling had improved.  (*Id.*)  Dr. Lancaster's examination confirmed that Beek's ulcer was healing, and there was no lower extremity edema.  (*Id.*)  She advised

16

Beek that she was reluctant to raise his Lantus–despite some high blood sugar readings–because of his low blood sugar episodes. (*Id.*) She expressed to him the importance of eating regular meals so that his blood sugars and medicines can be adequately controlled. (*Id.*) She also advised him to continue to use ointment on his ulcer. (*Id.* at 303.)

Beek returned to Dr. Lancaster for a follow-up on April 18, 2008. (Tr. at 300.) He reported that "he is still unable to eat at regular mealtime," and "sometimes he will eat a 'midnight snack' and eat all through the night." (*Id.*) He said that he could not eat regular meals because he "works at odd hours." (*Id.*) Several of his sugar readings were low. (*Id.*) Examination revealed that Beek's ulcer was almost completely scabbed over and was healing well. (*Id.*) Dr. Lancaster ordered a decrease in the Lantus due to the low blood sugar readings, and she asked Beek to try to eat regular meals and to return in two weeks for a follow-up. (*Id.*)

On May 2, 2008, Beek visited Dr. Lancaster for a follow-up. (Tr. at 298.) Beek reported that he was still not eating regular meals, and his blood sugars continued to be variable. (*Id.*) He also reported that the ulcer on his left ankle was improving. (*Id.*) Dr. Lancaster decided to change Beek's treatment schedule by reducing his morning Lantus and adding Humalog at meals. (*Id.* at 298-99.)

Beek returned for another follow-up on May 12, 2008, and reported to Dr. Lancaster that he was doing well "and has not had as many low blood sugars." (Tr. at 286.) His ulcer was healing "very well." (*Id.*) Dr. Lancaster made some adjustments to Beek's medication regimen and directed Beek to return in two weeks. (*Id.*)

17

On June 2, 2008, Beek followed up with Dr. Lancaster and reported that he was still not eating regularly. (Tr. at 294.) Also, he was not always taking his medication with meals. (*Id.*) He had several lower extremity abrasions from "just bumping into things," and he complained of diarrhea and bowel incontinence. (Id.) On examination, Dr. Lancaster found no evidence of edema in the lower extremities, but there were some "openings of the skin" that did not appear to be infected. (*Id.*) Dr. Lancaster directed Beek to take medication and fiber supplements for his diarrhea and to comply "with the diet and taking his insulin." (*Id.*)

Beek followed-up with Dr. Lancaster again on June 17, 2008. (Tr. 292.) Dr. Lancaster noted that Beek continued to have a poor diet, but he was "not interested in seeing a dietician." (*Id.*) Beek reported that his ulcers were healing. (*Id.*) Dr. Lancaster recommended that Beek continue to watch his diet closely and to skip his insulin if he skips a meal. (*Id.*)

On July 2, 2008, Beek visited Dr. Sonja Belz, M.D., at the Nebraska Medical Center Clarkson Hospital-University Hospital for a follow-up. (Tr. at 290.) He complained of foot pain and a headache. (*Id.*) Testing indicated "intact sensation throughout both feet despite his complaint of foot pain." (*Id.*) Dr. Belz gave Beek guidelines for taking his medication and advised him that "his smoking is likely to continue to exacerbate pain in his extremities and potentially poor blood supply." (*Id.* at 291.) Beek was "not interested in trying another medication for peripheral neuropathy at this time." (*Id.*)

Beek returned for a follow-up with Dr. Belz on July 7, 2008, with complaints of leg swelling and foot pain. (Tr. at 288.) An examination revealed "2+ pitting edema" on the left leg and lesser swelling on the right. (*Id.*) There also was one superficial open wound on

18

Beek's left knee, and Dr. Belz detected wheezing when examining Beek's lungs.  (*Id.*)  Dr. Belz believed that Beek's swelling was "probably due to some right-sided heart failure," and she suspected that he likely had emphysema or COPD due to his wheezing and "significant tobacco abuse."  (*Id.* at 289.)  She ordered tests and prescribed new medications for Beek.  (*Id.*)

On July 29, 2008, Beek followed up with Dr. Belz and complained of lower extremity edema.  (Tr. at 280.)  Dr. Belz noted that Beek presented a similar complaint "about a month ago," and Beek improved after using inhalers.  (*Id.*)  She also noted that her concerns about Beek's heart were allayed by a normal echocardiogram, but lung tests "revealed mild obstructive disease probably consistent with emphysema."  (*Id.*)  Beek reported that he had "not done anything particular for his lower extremity swelling," such as wrapping his legs or elevating them, but they "improved on their own over the past couple of days."  (*Id.*)  He also reported that he continued to have chest pain, and although the pain was worse when he smoked, he continued his smoking habit.  (*Id.*)  On examination, Dr. Belz noted pitting edema 1+ to 2+ on both legs, "most notable around the ankle but [extending] up halfway to the shin."  (*Id.*)  She also observed "some superficial abrasions" on Beek's left heel and left knee, but no "acute infections, sores, or ulcers."  (*Id.*)  Dr. Belz opined that Beek's edema appeared to be improving on its own and through the use of inhalers, and she advised Beek to use the inhaler and to wrap and elevate his legs "if they get bad."  (*Id.* at 281.)  She also provided him with samples and a prescription for an inhaler, and she advised him to stop smoking.  (*Id.*)

Beek visited Dr. Belz on August 13, 2008, with complaints of ringing in his ears, headache, fatigue, and numbness in his left pinky finger.  (Tr. at 344.)  Beek reported that

19

his numbness occasionally extended up into his hand and arm.  (*Id.*)  Dr. Belz noted that Beek's blood sugar readings "[made] no sense"; specifically, the readings were lower after Beek ate a meal even though he took only a small amount of Humalog.  (*Id.*)  An examination of the left finger revealed "slightly decreased pinprick sensation compared to the other fingers."  (*Id.*)  Dr. Belz directed Beek to stop taking mealtime insulin and use only Lantus.  (*Id.* at 345.)  She also noted that Beek's finger numbness was consistent with ulnar neuropathy, and she instructed him to use Advil, rest his arm, and avoid putting pressure on the ulnar area.  (*Id.*)  She hoped to get Beek a hearing screen to address his tinnitus.  (*Id.*)  She also noted, "I do believe that [social security disability] would be appropriate for this patient as he has significant medical problems, is not receiving adequate healthcare, and seems to be both physically and in some ways intellectually handicapped."  (*Id.*)

On August 18, 2008, Beek followed up with Dr. Belz.  (Tr. at 342.)  His "main complaint" was numbness in his left fifth finger.  (*Id.*)  Dr. Belz noted, "For his diabetes, [Beek] brings in his blood sugars.  Again, they are still making no sense.  He goes from 332 before breakfast to 32 after breakfast without taking any mealtime insulin, which I just cannot account for."  (*Id.*)  She expressed concern that "something is not going right with the testing."  (*Id.*)  She also noted that Beek might have a B12 deficiency given his "very poor nutritional status."  (*Id.*)  On exam, Beek's left fifth finger showed "decreased sensation to pinprick or monofilament testing" and "decreased vibratory sense . . . compared to the others."  (*Id.*)  Dr. Belz asked Beek to bring in his glucometer and test strips during his next visit to "make sure that he is doing this correctly and compare it to our own blood sugar measurements."  (*Id.* at 343.)  She added, "my goal for him would be to

return to as many oral agents as possible and reduce the use of insulin in this patient as I am not sure that he is sophisticated enough to do it very well." (*Id.*)

On August 29, 2008, Dr. Belz wrote a letter stating that Beek has "poor health exacerbated by the fact that he has limited access to health care and to medications that he requires for optimal care." (Tr. at 346.) Her letter also states that Beek "appears to have some cognitive deficits" because he "has had difficulty understanding the complexities of his disease, his drug regimen, and lifestyle choices." (*Id.*) The letter concludes, "I believe Mr. Beek has significant health problems including diabetes with complications. His condition is deteriorating due to lack of healthcare and, I believe, limited intellectual capacity. He would certainly benefit from disability status." (*Id.*)

### Beek's Testimony

On August 27, 2008, Beek testified at the administrative hearing before the ALJ. (Tr. at 364-385.) Beek testified that he stopped working in April 2006 because of his chest pains, dizziness, and uncontrolled blood sugar. (*Id.* at 369.) He said that he had been earning $50 per week over the last year by doing maintenance work, cleaning, and taking calls for his landlord. (*Id.* at 369-70.) He explained that this work was part-time, and he was allowed to work at his own pace and take breaks any time he needed to. (*Id.* at 379.) He added that he could probably work 45 minutes without sitting down for a 15-minute rest. (*Id.* at 380.) When not working, Beek spent his days "at home relaxing, watching TV or play[ing] games on the internet." (*Id.* at 381.) Beek said that he graduated high school and could read, write, and handle his own money. (*Id.* at 370-71.) He also said that he gets financial help for his medications, but he admitted that he had been using his money "to buy smokes and pop and stuff like that." (*Id.* at 383-84.)

21

***Vocational Expert's Testimony***

During the hearing, the ALJ asked a vocational expert ("VE") to consider a hypothetical claimant with Beek's age, education, and past work history who could lift up to 20 pounds occasionally; could lift 10 pounds frequently; could sit for six hours and stand for six hours in an eight-hour workday; could use his extremities without limitation; could occasionally bend, stoop, kneel, and crawl; could not see with his right eye; could not use ladders or scaffolds; could carry on a conversation despite occasional stuttering; should avoid exposure to concentrated heat, cold, and hazards such as open machinery and heights; should avoid even moderate exposure to noise; could hear effectively with a hearing aid in "a non-noisy background"; and would need to go to the restroom two or three times per day outside of regularly scheduled breaks.  (Tr. at 386-87.)  He then asked the VE whether this person could return to any of Beek's past relevant work.  (*Id.* at 387.)  The VE responded negatively, explaining that "the limitation to moderate noise and lifting of 20 pounds would preclude him from both of [Beek's] past occupations."  (*Id.*)  The ALJ then asked whether there were "other jobs in the regional or national economy that with those limitations could be done."  (*Id.*)   The VE responded affirmatively, stating that the hypothetical individual could work in positions such as "counter attendant," "office helper," and "storage facility rental clerk."  (Id. at 388.)

## THE ALJ'S DECISION

After following the five-step sequential evaluation process set out in 20 C.F.R. §§ 404.1520(a) and 416.920(a), the ALJ concluded that Beek is not disabled within the meaning of the Social Security Act.  (Tr. at 18-28.)  At step one, the ALJ found that Beek has not engaged in substantial gainful work activity since April 30, 2006, the alleged onset

22

date of disability.  (*Id.* at 21.)  At step two, the ALJ found that Beek has the following

"medically determinable impairments which have imposed more than slight limitations upon

his ability to function: insulin-dependent diabetes mellitus with diabetic neuropathy,

blindness in his right eye, hearing loss, chronic diarrhea, and a history of pericardial

effusions requiring surgical intervention in 1996."  (*Id.*)  At step three, the ALJ found that

Beek does not have an impairment or combination of impairments that equals one of the

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 22.)  At step four,

the ALJ determined that Beek has the following residual functional capacity ("RFC"):

> [Beek] can occasionally lift/carry items weighing 20 pounds, frequently
> lift/carry items weighing up to 10 pounds, sit for 6 hours during an 8-hour
> workday, and stand/walk for 6 hours during an 8-hour workday.  He has the
> unlimited use of his arms and hands.  He can occasionally perform postural
> activities including bending, stooping, kneeling, and crawling; however, he
> cannot climb ladders or scaffolds and is blind in one eye.  While he has
> bilateral hearing loss, he can hear and carry on a normal conversation.
> However, he should avoid environments with loud background noise, and
> should also avoid exposure to temperature extremes and hazardous work
> environments.  Finally, because of reports of chronic diarrhea, he would need
> a job that would allow him to go to the bathroom 2-3 times per day when
> necessary.

(*Id.* at 22-23.)  The ALJ also found that Beek is incapable of performing "his past relevant

work as a dishwasher, prep cook and brewery laborer."  (*Id.* at 25.)  At step five, the ALJ

concluded that, given Beek's age, education, work experience, and RFC, he is capable of

performing "various light occupations . . . that exist in the regional and national economies

in significant numbers.  (*Id.* at 27.)  By way of example, the ALJ found that Beek could work

as a "counter attendant," "office helper," and "storage facility rental clerk."  (*Id.*)[7]

---

[7] "Through step four of this analysis, the claimant has the burden of showing that
[]he is disabled."  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  After the analysis
reaches step five, however, "the burden shift[s] to the Commissioner to show that there are

## STANDARD OF REVIEW

The court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

The court must also determine whether the Commissioner's decision "is based on legal error."  *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000).  The court does not owe deference to the Commissioner's legal conclusions.  *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).

---

other jobs in the economy that [the] claimant can perform."  *Id.*

**DISCUSSION**

Beek claims that the Commissioner's decision must be reversed because "the ALJ improperly assessed Beek's credibility under the regulations and case law" and "failed to support his decision to reject Dr. Stearnes opinion." (Pl.'s Br. at 9, ECF No. 13.)   Each of Beek's arguments will be analyzed below in turn.

***The ALJ's Credibility Assessment***

Beek argues that the ALJ made three distinct errors when discrediting his "subjective complaints." (Pl.'s Br. at 9.)   First, Beek argues that "[t]he ALJ failed to consider the evidence under the *Polaski* factors." (Pl.'s Br. at 10.)   As the Eighth Circuit has explained,

> In assessing a claimant's credibility, the ALJ must consider all of the evidence relating to the subjective complaints, the claimant's work record, observations of third parties, and the reports of treating and examining physicians. 20 C.F.R. § 404.1529(c)(3);  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ should consider the claimant's daily routine; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski*,  739 F.2d at 1322.   When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the *Polaski*  factors.

*Dipple v. Astrue*, 601 F.3d 833, 836-37 (8th Cir. 2010).  The ALJ is not required to discuss each of these "*Polaski* factors" methodically, however, provided that he "acknowledges and considers the factors before discounting a claimant's subjective complaints."  *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).

As Beek notes, the ALJ's decision does include a lengthy quote of 20 C.F.R. §§ 404.1529 and 416.929; a statement that these regulations are consistent with *Polaski*; and a quotation from Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).  (*See* Tr.

25

at 24-25; Pl.'s Br. at 10.)   Beek characterizes this portion of the ALJ's decision as "boilerplate," however, and submits that "[f]ollowing his quotation of the regulations, the ALJ provided little analysis."  (Pl.'s Br. at 10.)  More specifically, he states,

> The ALJ declined to provide any indication that he considered the *Polaski* factors.  The ALJ never discussed any inconsistencies between Beek's subjective complaints and the medical evidence.  The ALJ never noted that Dr. Belz attributed Beek's difficulty complying with his medications to "cognitive deficits." (R. 346).  The ALJ did not address whether the ability to work part-time was consistent with Dr. Stearnes' findings that Beek would need to take unscheduled breaks during the workday. (R. 272).  Nor did the ALJ discuss Dr. Stearnes' conclusion that although Beek could perform some work, his attendance would be inconsistent or sporadic due to his condition. (R. 268, 274).  Instead, the ALJ simply concluded that Beek's part-time work meant that any allegations of disability were not credible.  (R. 25).

(Pl.'s Br. at 10-11.)

The court does not agree that the ALJ "declined to provide any indication that he considered the *Polaski* factors."  (Pl.'s Br. at 10.)  Aside from his general discussion of the mechanics of a credibility analysis (*see* Tr. at 24-25), the ALJ indicated that he considered the evidence relating to Beek's subjective complaints (*e.g.*, Tr. at 25 ("At his hearing, the Claimant testified that he has been unable to work due to the symptoms described in the summary of medical evidence set forth earlier in this decision."); *see also id.* at 21-22), Beek's work record (*e.g.*, Tr. at 20-21, 23, 25), reports of treating and examining physicians (*e.g.*, Tr. at 21-22, 23, 25), the effectiveness of medication and Beek's treatment compliance (*e.g.*, Tr. at 22, 23), and Beek's functional restrictions, (*e.g.*, Tr. at 23).  Also, it cannot be said that the ALJ failed to discuss medical evidence that was inconsistent with Beek's claim of total disability.  (*See, e.g.*, Tr. at 21-23.)  Moreover, the ALJ did not "simply conclude[] that Beek's part-time work meant that any allegations of disability were not credible."  (Pl.,'s Br. at 11.)  Rather, the ALJ found that Beek's credibility was undermined

26

by the fact that he "worked three jobs on a part-time basis," but "quit working only so that he could qualify for Medicaid and/or other public assistance." (Tr. at 25.)

Beek argues that the ALJ erred by failing to discuss Dr. Belz's suspicions that Beek might have cognitive deficits or Dr. Stearnes' opinion that Beek might need unscheduled breaks or have sporadic attendance. (Pl.'s Br. at 10-11.)[8] But "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). Indeed, the ALJ did consider Dr. Stearnes' opinion that Beek's attendance would be sporadic (*see* Tr. at 23), and, as will be discussed below, he decided to discredit that opinion. Also, the ALJ's RFC assessment incorporates a finding that Beek "would need a job that would allow him to go to the bathroom 2-3 times per day when necessary," (Tr. at 23), which appears to address Beek's allegation that he might need unscheduled breaks.

The ALJ's decision does lead the reader to believe that the ALJ's credibility analysis is contained within a relatively short paragraph that focuses on Beek's decision to quit working solely to obtain government benefits. (*See* Tr. at 25.) But the decision, read as a whole, sets forth additional reasons for discounting Beek's testimony in accordance with *Polaski*. The court finds that the ALJ's decision is arguably deficient, but any deficiency is limited to the ALJ's "opinion-writing technique" and has no bearing on the outcome of the case. *See Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008) (citing *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008)). In short, because the ALJ's credibility determination is

---

[8] The court notes, however, that the ALJ's RFC assessment incorporates a finding that Beek "would need a job that would allow him to go to the bathroom 2-3 times per day when necessary." (Tr. at 23.)

supported by good reasons and substantial evidence, this court owes deference to it. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). *See also Pense v. Barnhart*, 142 F. App'x 954, 954-55 (8th Cir. 2005) ("While the ALJ could have more clearly articulated the bases for his credibility findings, we conclude that the ALJ's adverse credibility determination was supported by the multiple valid observations the ALJ made in his discussion of the medical evidence and Pense's testimony and reports.")

Second, Beek argues that the ALJ erred by discrediting Beek based on his ability to do part-time work. (Pl.'s Br. at 11-13.) The ALJ's decision states,

> [T]he undersigned notes that, in spite of his allegations of total disability, the Claimant has, at times pertinent herein, worked three jobs on a part-time basis. He quit working only so that he could qualify for Medicaid and/or other public assistance. In fact, he told Dr. Stearnes on April 9, 2007 that if he obtained work, he would lose his public housing or face an increase in his rent. Furthermore, . . . on June 13, 2007 Dr. Stearnes stated that Mr. Beek "is able to work" but "really does not want to because then he will lose his public housing."

(Tr. at 25.) Thus, the ALJ did not discredit Beek simply because he held part-time work at one point or another, but also because there was evidence that Beek avoided gainful activity in order to retain his housing benefits. It was appropriate for the ALJ to consider the fact that Beek engaged in part-time work when determining his RFC. *See, e.g., Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004); 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); 20 C.F.R. § 416.971. (*See also* Pl.'s Br. at 11 (citing *Harris*, 356 F.3d at 930).) It was also appropriate for the ALJ to consider Beek's lack of motivation to return to work. *Cf. Ramirez v. Barnhart*, 292 F.3d 576, 581 & n.4 (8th Cir. 2002); *see*

28

*also Tuttle v. Barnhart*, 130 F. App'x 60, 61 (8th Cir. 2005) ("[E]vidence indicating a lack of motivation to work may be used as a credibility factor so long as it is not a dispositive one.").  There is no error.

Nevertheless, Beek submits that because he "never testified that he was completely incapacitated because of diabetic neuropathy," and because the record shows that he had the ability to do part-time–but not full-time–work, "[h]is part-time work actually bolsters his credibility."  (Pl.'s Br. at 12-13.)  He also points to Dr. Stearnes' statements that Beek had a good "work ethic" but should "cut back on his work to address his declining health."  (*Id.* (quotation marks omitted).)  As noted above, it was proper for the ALJ to consider Beek's part-time work as evidence of ability to perform substantial gainful employment.  Also, although Dr. Stearnes did feel at times that Beek should cut back on his work in order to gain control of his diabetes (*see, e.g.*, Tr. at 215 (indicating that Dr. Stearnes gave Beek a note excusing him from work "until next Monday to get his blood sugars under better control")), she also believed that he was capable of working "at least part-time" (*see, e.g.*, *id.* at 338).  Furthermore, on at least one occasion, Dr. Stearnes advised Beek to cut back on work  "so that he may qualify for Medicaid to get his medicines."  (*Id.* at 219.)  The ALJ's conclusion that Beek was motivated to limit working is supported by substantial evidence.

Third, Beek argues that the ALJ erred by failing to recognize that Beek's "limited cognitive ability" excused his noncompliance with treatment.[9]   "[A]n ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medications . . . and [failing to] quit smoking."  *Choate v.*

---

[9] Beek appears to concede that he has not complied with his prescribed treatment.

*Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (citations omitted).  *See also Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.").  If, however, there is "overwhelming evidence in the record expressly indicating that the claimant's severe mental disorder caused [his] noncompliance with psychiatric medication," noncompliance with treatment should not be held against the claimant.  *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (discussing *Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009)).

Beek argues that the instant case is analogous to Pate-Fires, and the ALJ erred by failing to recognize that his noncompliance was attributable to his "cognitive deficits."  (Pl.'s Br. at 14.)  The court is not persuaded.  In *Pate-Fires,* the Eighth Circuit noted that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse.'" 564 F.3d at 945 (citations and brackets omitted).  The court also observed that "psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication,'" and that all of the available evidence in the case pointed to the conclusion that Pate-Fires's noncompliance was a manifestation of her schizoaffective or bipolar disorder.  *Id.* at 945-46 (citation omitted).  The court held that under these circumstances, "the ALJ's conclusion that Pate-Fires's medical noncompliance was not justifiable and precludes a finding of disability is not supported by substantial evidence."  *Id.* at 946.  Here, although there is evidence indicating that Dr. Belz and Dr. Stearnes questioned Beek's cognitive abilities, there is no evidence that Beek is "a mentally ill person" who lacks "the rationality to decide whether to continue treatment or medication." Nor was Beek's noncompliance a manifestation of the disorder that the foregone treatment

30

was meant to address.  Moreover, unlike *Pate-Fires*, the evidence here does not point all

in one direction: there are facts indicating that Beek had incentives to avoid work and that

his noncompliance was willful.  Indeed, during the hearing, the ALJ specifically asked Beek

about his noncompliance, and Beek gave the following answer.

> Well, the reason at the time I didn't have no Medicaid then.  I didn't
> have the Medicaid, there's no way I can afford to get my medications.  But,
> yeah, I'll be honest with you, I have been using my money to buy smokes
> and pop and stuff like that.

(Tr. at 384.)

*Pate-Fires* is distinguishable from the instant case, and the ALJ did not err to the

extent that he considered Beek's noncompliance to undermine his credibility.

### The Treating Source Statement from Dr. Stearnes

Beek argues that the ALJ erred by discounting Dr. Stearnes' opinion that Beek was

disabled.  (Pl.'s Br. at 15-18.)  Because Dr. Stearnes is a treating physician, her opinion "is

accorded special deference under the social security regulations."  *Vossen v. Astrue*, 612

F.3d 1011, 1017 (8th Cir. 2010) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir.

2000)).  *See also Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010) (explaining that a

treating physician's opinion "will be granted controlling weight when [it is] well-supported

by medically acceptable diagnostic techniques and not inconsistent with other substantial

evidence in the record.").  Nevertheless, an ALJ may discount a treating physician's opinion

under certain circumstances.  For example, a treating physician's opinion may be given

reduced weight if other medical assessments are supported by superior medical evidence

or if the treating physician has offered an inconsistent opinion.  *See Wagner v. Astrue*, 499

F.3d 842, 849 (8th Cir. 2007); *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001).

31

*See also Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (noting that the ALJ must "resolve conflicts among 'the various treating and examining physicians'"). Also, "[w]hen deciding 'how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations.'" *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (quoting *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007)). *See also* 20 C.F.R. § 404.1527(d)(2)(i); 20 C.F.R. § 416.927(d)(2)(i). "When an ALJ discounts a treating physician's opinion, [s]he should give good reasons for doing so." *Id.*

In this case, the ALJ discounted Dr. Stearnes' opinions that Beek was unable to work, stating,

> [S]he failed to cite any specific clinical or laboratory findings to support her conclusions. Furthermore, she has admitted that the Claimant's diabetes could be controlled, and issued at least two of these statements [that Beek was unable to work] in an attempt to qualify him for free medical treatment. In point of fact, she had earlier encouraged the Claimant to reduce his employment for the sole purpose of qualifying him for Medicaid. Furthermore, on June 13, 2007 Dr. Stearnes stated that Mr. Beek "is able to work" but "really does not want to because then he will lose his public housing." Thus, her opinions regarding the Claimant's ability to work or obtain employment, as well as her conclusions with respect to his functional abilities, are simply not entitled to weight or consideration in accordance with SSR 96-2p, SSR 96-5p, or SSR 06-3p.

(Tr. at 23 (citations omitted).)

Beek argues first that the ALJ erred by concluding that Dr. Stearnes failed to cite specific clinical or laboratory findings to support her conclusions. (Pl.'s Br. at 16-17.) In support of this argument, Beek states that "[t]he ALJ specifically disregarded Dr. Stearnes' determination that Beek needed to elevate his legs when sitting for long periods," even though "the medical evidence in the record supports this limitation." (*Id.* at 16.) He adds

32

that he suffered from pitting edema in his lower legs due to his uncontrolled diabetes, and that "[e]levation is a common treatment for edema in the lower legs." (*Id.* at 16 & n.11 (citing Kelley's Textbook of Internal Medicine 1150 (4th ed. 2000)).)

The court will assume that elevation is a common, appropriate treatment for edema in the lower legs, and it is true that Beek experienced pitting and nonpitting edema at certain times. It is noteworthy, however, that Beek refers me to no evidence that Dr. Stearnes ever advised him to elevate his legs to treat his edema. Also, the record indicates that Beek suffered from edema sporadically, and that it was ameliorated by treatments other than leg elevation. As the ALJ correctly concluded, Dr. Stearnes' opinion that Beek would have to elevate his legs 50% of the time in a sedentary job is simply not supported by clinical findings that Beek needed to elevate his legs with such frequency.

Beek also suggests that there is ample evidence that his "diabetes was out of control," including observations of edema and blood testing. (Pl.'s Br. at 17.) But the ALJ did not discount Dr. Stearnes' opinion that Beek's diabetes was often out of control. Rather, he discounted her opinion that Beek was unable to work because of his diabetes due to the functional restrictions it imposed on him. Beek's claim that he clearly does suffer from diabetes–a point not in dispute–does not address the relevant issue.

Finally, Beek argues that the ALJ erred by crediting Dr. Stearnes' statements that Beek could work while discrediting her assessment of Beek's functional capacity and her suggestion that Beek forgo work until his blood sugars were controlled. (Pl.'s Br. at 17-18.) The question of whether an individual is disabled is an issue that is reserved to the Commissioner, and a treating physician's opinion on such a matter is not "entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2,

33

1996).  "However, opinions from any medical source on issues reserved to the Commissioner must never be ignored."  *Id.* at *3.  "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record."  *Id.*  It was appropriate for the ALJ to consider Dr. Stearnes' statement that Beek could work but simply did not want to in order to preserve his benefits, and it was also appropriate for him to consider the fact that Dr. Stearnes advised Beek to reduce his workload solely to qualify for Medicaid.  To the extent that Dr. Stearnes' opinions are in conflict, it is the ALJ's function to resolve the conflicts in light of the record as a whole.  *E.g., Heino v. Astrue*, 578 F.3d 873, 879-80 (8th Cir. 2009).  The ALJ's decision to afford greater weight to Dr. Stearnes' opinion that Beek was capable of work was supported by substantial evidence, and therefore it cannot be reversed "even if inconsistent conclusions may be drawn from the evidence."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

## CONCLUSION

For the reasons discussed above, the court concludes that the Commissioner's decision denying benefits must be affirmed.

**IT IS ORDERED** that the decision of the Commissioner is affirmed, and a separate Judgment in favor of the Defendant will be entered.

DATED this 8th day of June 2011.

BY THE COURT:

S/ F.A. Gossett, III
United States Magistrate Judge

34